(C. D. 941)

LIAN BROS. *v.* UNITED STATES

United States Customs Court, Third Division

(Decided July 12, 1945)

*Fred Bennett* (*Otto Fix* of counsel) for the plaintiff.
*Paul P. Rao,* Assistant Attorney General (*Alfred A. Taylor, Jr.,* special attorney), for the defendant.

Before CLINE, KEEFE, and EKWALL, Judges

EKWALL, Judge: This case involves the rate at which Shanghai yuan dollars in which certain imported merchandise was invoiced should be converted into United States dollars under section 522 (c) of the Tariff Act of 1930. There is no dispute but that the exchange value, as represented by the buying rate in the New York market at noon on the day of exportation as defined in said section 522 (c), is applicable in this case, the only question being the date of exportation. The goods were shipped from Shanghai, China, on September 16, 1939, on the *Arima Maru.* That vessel stopped at Keelung, Formosa, sailing therefrom on September 17, made another stop at Dairen in the Kwantung Territory, from which it sailed on September 24, and thence touched at various Japanese points on the way to the United States.

The collector used as the basis for conversion of the Shanghai yuan dollars the Federal Reserve rate prevailing on September 23, the export date from Dairen (September 24 falling on a Sunday, see T. D. 43600). It is claimed by the plaintiff herein that Dairen is not a a Chinese port and therefore the date of sailing from Shanghai should govern.

The customs regulations in effect at the time this merchandise was exported are found in article 822 of the Customs Regulations of 1937 and insofar as pertinent are as follows:

Art. 822 *(e)* The date of exportation for currency conversion shall be fixed as follows:

(1) The date of exportation shall be the date on which the merchandise actually leaves the country of exportation for the United States.

(2) If the merchandise is shipped directly by water from the country of export, the date of the sailing of the vessel shall be the date of exportation. In such cases a copy of customs Form 3167, "Daily report of arrival of vessels", giving the dates of sailing from each port, shall be daily supplied by the marine division to the entry and liquidating divisions, the comptroller of customs and such officers as may have need therefor, and a copy shall be posted or made available to the public in the port of arrival; but if the merchandise arrives in bond, the date of sailing shall be obtained from the lists circulated by the customs information exchange.

(3) Since the act of exportation is not complete until the merchandise finally leaves the jurisdiction of the exporting country, if a vessel with the merchandise on board sails from two or more ports, or more than once from the same port, of the exporting country, whether or not stopping on the intervening voyage at a port of another jurisdiction, or, if the merchandise is transshipped in another jurisdiction and subsequently reenters the jurisdiction of the exporting country on another vessel, or if the merchandise is transshipped to another vessel in the same jurisdiction, the date the vessel on which the merchandise finally leaves the exporting country sails from the last port thereof is the date of exportation.

There were offered and received in evidence by the plaintiff the collector's report on the protest and two letters from the Department of State, one under date of October 21, 1941, and the other dated April 3, 1942.

The collector's report after setting forth the sailing dates of the *Arima Maru*, the date taken as the date of exportation and the plaintiff's claim, states as follows:

Keeling, Formosa, is considered by the Collector a Japanese port, that island having been ceded to Japan by China in 1895, and would not have any bearing in determining the date of export in the instant case. As to Dairen, while the collector is aware of its being under Japanese control, he has no knowledge of any announcement by the State Department that a change of jurisdiction has been recognized by the United States and, consequently, for Customs purposes it is still considered a Chinese port.

The letter from the Department of State under date of October 21, 1941, reads as follows:

DEPARTMENT OF STATE,
*Washington, October 21, 1941.*

In reply refer to
FE 893.01/925

My Dear Mr. Bennett:

The receipt is acknowledged of your letter of October 1, 1941 requesting information in regard to the status of the port of Dairen on September 23, 1939 and September 24, 1939.

The status of the port of Dairen (earlier known as Dalny and sometimes as Ta-lien-wan) was defined in the convention between Russia and China on March 27, 1898 for the lease of the Liaotung Peninsula. The term of this leasehold was for twenty-five years, and during this period "the entire military command of

the land and naval forces and equally the supreme civil administration will be entirely given over to the Russian authorities" (Article 4). The convention specifically stated, however, that "This act of lease, however, in no way violates the sovereign rights of H. M. the Emperor of China to the above-mentioned territory" (Article 1). The boundaries of the leased territory in the Liaotung Peninsula were defined in a subsequent agreement between Russia and China concluded May 7, 1898. A related agreement dealing with the customs administration, railroad construction, et cetera, within the leased territory was entered into by China and Russia on July 6, 1898. Following the Russo-Japanese War of 1904–5, Russia (with China's consent, given by China in a treaty with Japan concluded December 22, 1905) ceded to Japan her rights under the foregoing convention and agreements; the particulars of this cession are set forth in the Treaty of Peace between Russia and Japan of September 5, 1905. Subsequently, under a treaty and exchange of notes dated May 25, 1915 between China and Japan the lease of the territory in question was extended to the year 1997. With regard to these and other instruments of May 25, 1915, the Government of the United States made a prior reservation of rights in notes to the Chinese and Japanese Governments.

The treaties and agreements mentioned above are directly concerned with the status of Dairen. Another agreement which would be of interest, as bearing on the subject, is that of May 30, 1907, between Japan and China in regard to the establishment of a Chinese Maritime Customs office at Dairen and the question of inland waters steam navigation. The texts of these and other related treaties and agreements may be found in collections of treaties and agreements with and concerning China, among which may be mentioned MacMurray's two volumes *Treaties and Agreements With and Concerning China, 1894–1919.*

It is suggested that you may also wish to refer to *The International Legal Status of the Kwantung Leased Territory* (1931) by C. Walter Young. It should be understood, of course, that the Department assumes no responsibility for statements contained in unofficial publications.

It may also be mentioned that the American Consul at Dairen, Manchuria, derives his exequatur from the Japanese Government, which Government administers the Kwantung Leased Territory. For that reason the American Consulate at Dairen is listed under the Japanese Empire in the *Foreign Service List* issued by the Department of State. Nevertheless, this Government continues to recognize that sovereignty in the Kwantung Leased Territory is vested in the Chinese Government. There has been no change in this Government's attitude towards this question in recent years.

Sincerely yours,

(Signed) MAXWELL M. HAMILTON,
Maxwell M. Hamilton,
*Chief, Division of Far Eastern Affairs.*

The letter under date of April 3, 1942, merely states that the above-quoted observations are equally applicable to Kwantung Leased Territory during the period September 1 to September 20, 1939.

Both counsel have furnished the court with excellent briefs covering the legal aspects of this case which we have read with interest. We desire to compliment them upon the very evident thoroughness of their research in the preparation of same.

Plaintiff's principal contention is that although China maintains sovereignty over the Kwantung Leased Territory, including the port

of Dairen, jurisdiction of that territory is vested in Japan; that the reservation of the sovereign rights of China in that territory does not mean that, for the term of the lease at least (until 1997) China retained any jurisdiction in said territory, nor does it mean that said territory remained a part of the country of China within the meaning of the term "country" as used in the Tariff Act of 1930. In support of this contention plaintiff cites the case of *Stairs* v. *Peaslee*, 18 How. 521, 15 L. ed. 474, wherein the Supreme Court defined the term as follows:

\* \* \* the word "country" in the revenue laws of the United States has always been construed to embrace all the possessions of a foreign state, however widely separated, which are subject to the same supreme executive and legislative control.

Counsel on each side quotes extensively from the publications referred to in the letter from the State Department set forth above, as supporting his position. However, it is noteworthy that this letter while mentioning these publications, states:

\* \* \* It should be understood, of course, that the Department assumes no responsibility for statements contained in unofficial publications.

It is also noted that said letter states in connection with the extension of the lease of the territory in the Liaotung Peninsula, the following:

\* \* \* With regard to these and other instruments of May 25, 1915, the Government of the United States made a prior reservation of rights in notes to the Chinese and Japanese Governments.

In "The International Legal Status of the Kwantung Territory" by C. Walter Young, mentioned in the letter of the State Department above quoted, we find the following at page 70, quoted in the brief for the Government:

Whether Dairen, the chief trade port of Manchuria, is, for the purpose of applying the coastwise shipping laws of Japan, a Japanese coastal port has long been a subject of controversy, and one on which the Japanese ministries for foreign affairs and finance have at times differed. It appears that this question arose in August, 1906, and that the Ministry of Foreign Affairs presented the diplomatic corps at Tokyo with a statement that although the Kwantung leased territory was under Japanese jurisdiction the regulations governing coastwise shipping could not be applied to Dairen. Dairen was declared to be a free port, and, for the purpose of the application of the Japanese coastwise shipping laws, a colonial port.

\* \* \* \* \* \* \*

And at pages 72–73:

This confusing controversy has not been finally settled even though a new test case arose when the "City of Derby", a vessel of British registry belonging to the Ellerman line, took aboard at Yokohama, on the sixteenth of November, 1929, a cargo of six motor cars billed to Dairen in Kwantung province. The superintendent of customs at Dairen permitted the landing of the cargo. A protest was immediately made by local Japanese steamship companies which sought to forfend foreign competition. The Ministry for Foreign Affairs, evidently con-

sidering it a political question, in accordance with its original ruling of 1906 instructed the Finance Ministry, which in turn instructed the Japanese customs officials, that the landing of the cargo was not a violation of the Japanese coastwise shipping laws because Dairen was not considered a coastwise port of Japan.

In spite of the fact that other somewhat similar cases have arisen recently, involving the issue as to whether or not Dairen is to be regarded as a coastwise port of Japan, there does not seem to be an entirely definitive ruling on the subject by the Ministry of Foreign Affairs, concurred in by the other Departments of government, and communicated in decisive terms to foreign governments concerned.

While we do not consider this decisive of the question before us, it is enlightening in that it states Dairen to be a free port.

We do not consider it necessary to decide the question of the distinction made by plaintiff in his brief between the sovereignty of the Kwantung Territory and the jurisdiction of that territory, inasmuch as actual exercise of jurisdiction within certain territory, however exclusive it may be, juristically speaking, is an exercise only of delegated or conferred rights, the real source of which must be traced to the state which has sovereignty itself. It is clear that the right to recover her territory upon the expiration of the lease remained in China, as evidenced by the fact that Japan took care to renew her lease of the Kwantung Territory prior to its expiration date.

In view of the position of the State Department as evidenced by the letter above quoted and of the confusion which is shown to have existed over a considerable period of time as to the exact status of Dairen, we are constrained to hold that the collector, in adopting the date that this vessel left Dairen as the sailing date from China for the purpose of applying the rule of conversion of currency as set forth in section 522 (c), *supra*, was acting within his legal authority.

We therefore overrule plaintiff's claim.

Judgment will be rendered in favor of the defendant.